[stamp illegible] 2007

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
PROVIDENCE DIVISION

CA 07 172S

UNITED STATES OF AMERICA
Plaintiff/Respondent

v.

JUAN GIRALDO
Defendant/Petitioner

CASE #CR-04-074-01S

**HABEAS CORPUS MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

"PLEA FOR LIBERAL CONSIDERATIONS"

Juan Giraldo, Petitioner PRO SE, respectfully moves this Honorable Court, to grant all considerations with respect to this section pursuant to **Haines v. Kerner, 404 US 519 (1972)**, as defendant is not an attorney, has not attended any Law School and has not professional training with respect to the filing of legal proceedings.

## ISSUES PRESENTED

A) INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTOR'S MISCONDUCT: DUE TO THESE CONSTITUTIONAL VIOLATIONS THE DISTRICT COURT ERRONEOUSLY ENHANCE DEFENDANT'S SENTENCE BASED ON HYPER-INFLATED FINDINGS AFTER DEFENDANT REFUSED TO COMMIT A SECOND CRIME.

B) INEFFECTIVE ASSISTANCE OF COUNSEL AND PROSECUTOR'S MISCONDUCT: FAILING TO NOTIFY THE HONORABLE COURT THAT THE DEFENDANT SIGNED THE PLEA AGREEMENT KNOWING FOR CERTAIN TAHT THE "LEADER ROLE" ALLEGATION OF THE INDICTMENT HAD BEEN ELIMINATED COMPLETELY.

C) INEFFECTIVE ASSISTANCE OF COUNSEL: DEFENSE COUNSEL FAILED TO NOTIFY THE COURT THAT THE U.S. ATTORNEY BREACHED THE PLEA AGREEMENT IN SENTENCING HEARING.

D) INEFFECTIVE ASSISTANCE OF COUNSEL: DEFENSE COUNSEL FAILED TO INFORM THE COURT THAT DUE TO DEFENDANT'S ALIEN/DEPORTABLE STATUS, THE SEVERITY OF HIS SENTENCE WAS INCREASED.

E) INEFFECTIVE ASSISTANCE OF COUNSEL: DEFENSE COUNSEL FAILED TO NOTIFY THE HONORABLE COURT THAT PETITIONER WAS ENTITLED TO A DOWNWARD DEPARTURE DUE TO HIS STATUS AS A DEPORTABLE ALIEN.

F) CONCLUSION.

NOTE: Defendant has attached here all documents and transcripts in his possession. For a more complete information, please see all records from the beginning of the case in the files of the District Court and the U.S. Attorney's Office. The original Docket Number is CR-04-074-01S.

**Ineffective Assistance of Counsel and Prosecutor's Misconduct: Due to these Constitutional Violations The District Court erroneously enhanced defendant sentence based on hyper-inflated findings after defendant refused to commit a second crime.**

The only and one illegal transaction in this Case #CR-04-074-01S occurred on **March 14, 2004**, I Pled Guilty upon a Plea Agreement with the U.S. Government and accepted my responsibility; I have to add that I am very repetant and regretful of this bad act, all my life has been destroyed and that is my fault, no doubt about it, I broke myself the American Dream. However, I am very sure that the "enhancement" in my case for a "leader role" is totally illegal.

The only and unique crime in this case developed in a very close family setting, me, Juan Giraldo; my sister, Clara Giraldo-Vasquez; and her husband, Alberto Vasquez (my brother-in-law). As happens in most of the brotherly situations, Alberto and I had a normal relationship. We spoke about mundane things and details of every day life as any kind of brothers-in-law do, until reaching that point where family members instinctively start protecting amongst themselves and worrying about the problems of every related member.

Finishing the year 2003, Alberto begun to have financial problems, he told me about it, and I helped him the best I could, on the end he was my brother. Beginning 2004, Alberto financial problems persisted, he told me those difficulties were mounting and mounting.

On some point, Alberto Vasquez my brother, started to voice casually about making an illegal drug deal, to solve on a quickest way his urgent cash needs, an idea coming from him that I rejected from the beginning. He also told me that he had heard that a friend of mine was involved in the illegal drug trade, after that he kept pushing on and on, more than one thousand times the idea of making an illegal drug deal, he said he had a customer that he knew from long time ago; I refused always those advances, I just stayed aiding him the right way.

Next, he got desperated, he expressed me, he was not feeling comfortable that I was helping him too much to solve his affairs without him doing nothing to earn that aid; he told me enfatically, almost angered, that he wanted to solve his problems by himself, by his own initiative, by his own work. Of course I did not know on that time that my brother Alberto Vasquez was being paid $13,000.00 monthly by the D.E.A. working as a Confidential Informant, just to build a case against me and to obtain my conviction (see Exhibit A); unfortunately my brother Alberto Vasquez had become envious of my good sucess in legal business endeavors and projects, and my good luck in gambling (I recognized some tainted money was involved but that was the object of the Indictment and my Conviction in the Tax Evation case). My brother Alberto Vasquez was an easy prey, available to do anything against me, ready to do whatever asked, to invent if necessary, he wished deeply to see me punished and humilliated.

So finally on March 14, 2004 defendant's brother in law Alberto Vasquez instigated by officers of the government, induced defendant to commit the only and one crime of this Case #CR-04-074-01S. That simple transaction (no guns, no threats, no violence, no injuries, no victim) has been the object by the government of a big out of proportion aggrandizement, to create the impression of a nonexistent leader role in a blatant breaching of the restrictions imposed by the signed Plea Agreement and taking advantage of the weak arguments brougth by defense counsel in the Sentencing Hearing (basis for ineffective Assistance of Counsel).

Defense Counsel failed to object the introduction by the government of irrelevant conversations (fabricated translations) between defendant and brother at law that occurred after March 14, 2004 (the only base for the leader role enhancement). Those mundane and half drunk conversations did not have nothing to do with what happened on March 14, 2004. Basically what happened in reality was that the government got desperate **pushing defendant thru their informant TO COMMIT A SECOND CRIME** but they (D.E.A.) got mad because defendant did not have the means, defendant did not have no illegal drug to sale. For these reasons the government decided to use all these irrelevant post-March 14 mundane conversations to try to proof a suppossed leadership role that they were sure could not be proven in any other way, even knowing that nothing relevant had been said and even knowing that that portion of the indictment had been excised and eliminated from the Plea Agreement, in a outrageous violation of the terms of that signed contract. **See Casey v. United States, 48 S.Ct. 373**

As stated by Mr. Justice Brandeis, dissenting in **Casey v. United States**, 48 S.Ct. 373, at 376:

> "I am aware that courts--mistaking relative social values and forgetting that a desirable end cannot justify foul means--have, in their zeal to punish, sanctioned the use of evidence obtained through criminal violation of property and personal rights or by other practices of detectives even more revolting. But the objection here is of a different nature. It does not rest merely upon the character of the evidence or upon the fact that the evidence was illegally obtained. the obstacle to the prosecution lies in the fact that the alleged crime was instigated by officers of the government; that the act for which the government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature."

Mr. Justice Frankfurter stated the same philosophy that is applicable to this defendant's case in **Sherman v. United States**, 78 S.Ct. 819, at 826:

> "No matter what the defendant's past record and present inclinations to criminality, or the dephts to which he has sunk in the estimation of society, certain police conduct to ensnare him **into further crime** is not to be tolerated by an advanced society.' And he added:'The power of the government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime.'"

Mr. Justice Roberts in **Sorrels v. United States**, 53 S.Ct. 210 put this idea also applicable to this defendant's case in the following words:

> "'The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcaement of this overruling principle of public policy.'"

Defense Counsel also failed to make clear before the Honorable Court that although being sentenced on the same time for the Tax Money Evasion, the facts supporting these Tax Money charges were unrelated to the events of March 14, 2004; because in addition of the mundane conversations these tax money evasion charges were used also for purposes of enhancement (lifestyle, etc..). Defendant wants to make this violation clear thru what was said on the transcripts of the Tax Money Evasion case; these transcripts states:

"THE COURT: All right. I'm going to ask the Government now to outline the elements of the offenses that you are charged with as well as the facts that it would prove if this matter were to go to trial.

I want you to listen carefully to the facts, particularly to the facts, that the Government describes.
I'm going to ask you when they're done if you agree with those facts of this case.
You can sit down while he does this.

MR. LAWSON: Your Honor, for each of the four counts of the information, the Government would be required to prove the same three elements: First, that the defendant made an affirmative act and/or an attempt to evade and defeat an income tax and/or the payment thereof; secondly, that for each of the years for which he attempted to evade his income taxes that there would be an additional tax due and owing; and finally, that the defendant acted willfully in making these affirmative acts. In other words, that he intentionally violated a known legal duty.
Had this matter gone to trial, the Government would have proven the following beyond a reasonable doubt. Beginning at least as early as 1998 and continuing until his arrest on cocaine trafficking charges in July of 2004, the defendant, Juan A. Giraldo, was employed by Joseph A. Bevilacqua and worked at the offices of attorneys Bevilacqua and John Cicilline. He received regular payroll checks from Joseph Bevilacqua, occasionally supplemented by checks drawn on an account in the name of Bevilacqua and Cicilline. Those wages ranging from 59,000 to 68,000 over the four-year period in question were reported to the IRS on a form W-2 issued to the defendant from Joseph Bevilacqua, and, in turn, were reported by the defendant on his individual tax returns for calendar years 1999 through 2002.

[...Continuation...transcripts of the Tax Money Evasion case states...]

MR. LAWSON:...

In addition to the services he provided to Joseph Bevilacqua, the defendant received occasional payments from several other local criminal attorneys. For tax years 2000 through 2002, the defendant included on his tax returns income he received from an unspecified business, the receipts of which were reported on a Schedule C attached to his individual income tax returns.

The Government would have proven, however, that as charged in the criminal information, in each of the calendar years 1999 trough 2002, the defendant received a significant amount of additional income which he intentionally omitted from his filed tax returns.

The Government would have proven that one source of this additional income derived from the services he provided Joseph Bevilacqua. These services were essentially the defendant would refer criminal defendants facing state or federal narcotics charges to Attorney Bevilacqua. These defendnats or their families would make cash payments ranging from 10,000 to as high as $200,000 to retain the services of Attorney Bevilacqua.

The clients making these payments were promised a variety of benefits including guarantees that they could be released on bail, that charges would be dropped, or that Attorney Bevilacqua could keep their state charges from, quote, unquote, "going federal."

In some cases, the defendant provided interpreter services on behalf of Attorney Bevilacqua in his representation of those clients, and the defendant received a portion of the cash.

The defendant's bank records for the four years in question show that he made substantial cash deposits far in excess of his reported income for each year.

Over the four years in question, the defendant made cash deposits to his accounts totalling approximately $735,000. In addition to the cash deposits, the defendant used cash to purchase a large number of money orders, cashier's checks and bank checks which were then used for personal expenses or to pay credit cards in the defendant's name.

The defendant also made cash payments to credit cards and cash payments towards the purchase or lease of high-end automobiles including a Lexus and a Mercedes. These cash payments and purchases totaled approximately $264,000.

The defendant attempted to evade the taxes on this income in a variety of ways including his extensive use of cash, the purchase of monetary instruments such as cashier's checks, money orders and bank checks

[...Continuation...transcripts of the Tax Money Evasion case states...]

MR. LAWSON:...

Further, he structured the deposit of cash into his bank accounts in a manner designed to avoid triggering the filing of currency transaction reports.
He failed to provide his return preparer with accurate information as to his true income resulting in the preparation and filing of false and fraudulent individual income tax returns, which the defendant signed under penalties of perjury knowing them to be materially false.
The bank deposits method of proof was utilized to determine the amount of additional income the defendant faileed to report on his returns. This method of proof inures to the defendant's benefit, because it requires the elimination of income of any possible source of redeposited cash, such as ATM withdrawals, checks to cash, et cetera.
The defendant's additional taxable income was further reduced in the IRS analysis by giving him a business expense deduction for any expenditure that could not be conclusively determined to be personal.
For example, the defendant traveled extensively during this time period, including several trips to Columbia. The costs of all of this travel were treated in the IRS analysis as a business expense, and thus served to reduce his taxable income.
As a result of the defendant's efforts to evade his income tax, there is a substantial additional tax due and owing for each of the four years.
The bank deposits method of proof resulted in total additional taxable income of approximately $356,000 and a total tax due and owing for criminal purposes of $113,466.

THE COURT: All right. Thank you, Mr. Lawson. Okay. Mr. Giraldo, will you please stand.

**BY THE COURT:** (Continuing)

Q. Now, did you listen very carefully to the facts Mr. Lawson described as the facts of this case?

A. Yes, Your Honor.

Q. And do you agree that those indeed are the facts of this case?

A. Yes, I agree.

Q. I'm now going to ask you how you wish to plead to the offenses charged, guilty or not guilty?

A. I plead guilty, Your Honor."

Therefore, is translucent after this long intervention of Mr. Lawson of the Justice Department that nowhere he mentioned anything linking drug money with the Tax Money Evasion Case; however all this information was wrongly used to enhance defendant's sentence in violation of due process.

In mixing the information of the Tax Money Evasion case with the March 14, 2004 case, the Government is clearly breaching the terms of the two plea agreements signed; to demonstrate this we just have to take a look on what was accorded. The Tax Money Evasion's Plea Agreement on page 8 states (copy attached):

> "13. Defendant understands that Defendant may have the right to file a direct appeal from the sentence imposed by the Court. Defendant hereby waives Defendant's right to file a direct appeal, if the term of imprisonment imposed by the Court in this matter is fully concurrent with the term of imprisonment he receives in criminal case number **04-074S.** This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. §3742(b), and the government retains its right to appeal any of the Court's sentencing determinations.
>
> 14. **This agreement is binding on the government only if Defendant pleads guilty**, fulfills all Defendant's obligations under the agreement, does not engage in any conduct constituting obstruction of justice under §3C1.1 of the guidelines, and does not commit any new offenses. Defendant understands that if Defendant violates this agreement in any way, the government shall be released from its obligations under the agreement and will be free to make any recommendations that it deems appropriate. If that occurs, Defendant shall not have the right to withdraw Defendant's guilty plea.

Of course, defendant pled guilty in compliance with the Plea Agreement, however in Sentencing the Government used all that financial information of the Tax Money Evasion case (#04-53S) to make inflammatory arguments to support their illegal 'Leader Role Enhancement in a blatant violation of Due Process; also those statements of the AUSA constituted a breaching of the Plea Agreement. When the prosecutor fails to fulfill the agreement, the defendant is prejudiced because his rights are violated; See **Correale v. United States, 479 F.2d 944 (1st Cir.1973)** (noting that waiver of rights, in exchange for prosecutor's statements, is ineffective when agreement is violated); therefore, this instant case in a minimum must be remanded for resentencing.

**Ineffective Assistance of Counsel and Prosecutor Misconduct: failing to notify that the Defendant signed the Plea Agreement knowing for certain that the "Leader Role" allegation of the indictment had been eliminated completely**

Defendant signed the Plea Agreement knowing for certain that the "Leader Role" allegation of the original indictment had been eliminated completely. The Plea Agreement also was the base for the Sentencing Hearing. Defendant never admitted the "Leader Role" allegation. Therefore, the "Leader Role" enhancement in sentencing generated a **plain** Apprendi/Blakely/Booker **error**.

The Plea Agreement on Paragraph 1 (page 1) **clearly** states:

"1. Defendant will plead guilty to the following charges:

Count 1- knowingly and intelligently combining, conspiring, confederating and agreeing with CLARA VASQUEZ, and with other persons known and unknown to the Grand Jury, to distribute, 1,001 grams of a mixture or substance containing a detectable amount of cocaine, a Schedulle II controlled Substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B).

Count 2- knowingly and intentionally distributing, and possessing with intent to distribute, 1,001 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(B).

The **Blakely** case clarified that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. See **Ring v. Arizona, 536 U.S. 584 (2000):** "'the maximum he would receive if punished according to the facts reflected in the jury verdict alone'". In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose **without** any additional findings.

When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment", **(J. Bishop, Criminal Procedure, §87, p.55 (2d ed. 1872)**, and the judge exceeds his proper authority.

The Judge in this case could not have imposed the exceptional 71-month sentence solely on the basis of the facts admitted in the guilty plea (based in the Plea Agreement, the sentencing range must have been Level **23:**(46-57 months). Those admitted facts alone were insufficient because a reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense.

Pursuant to the signed Plea Agreement and the facts admitted in the subsequent hearings, those facts standing alone, supported a maximum sentence of 57 months. The Court imposed an "exceptional" sentence of 71 months after making a judicial determination that defendant had been a "Leader" in this offense. This arbitrary judicial determination violated defendant's Sixth Amendment right to trial by jury, this sentencing procedure has deprived defendant of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence.

This case required the application of the Rule expressed in **Apprendi.** This Rule reflects two longstanding tenets of common-law criminal jurisprudence: that the "truth of every acusation" against a defendant "should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours," **4 W. Blackstone (1769).**

All these **Apprendi** and **Blakely** holdings were confirmed in **U.S. v. Booker**, 125 **S. Ct.738 (2005).**

Any fact, other than a prior conviction, which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt. **U.S.C.A. Cont.Amend. 6.**

The constitution protects every criminal defendant against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

Federal Sentencing Guidelines, whih, as written, have force and effects of laws, are subject to jury trial requirements of the Sixth Amendment, notwithstanding availability of sentencing departures, which, although available in specified circumstances, are unavailable in most cases. **U.S.C.A. Const. Amend. 6: 18 U.S.C.A. §3553(b); U.S.S.G. §1B1.1.**

The constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with wich he is charged. **U.S.C.A. Cont. Amend. 6.**

"Any evaluation of Apprendi's "fairness" to criminal defendants must compare it with the regime it replaced, in which a defendant, with no warning in either his indictment or **plea**, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, **see U.S.C. §841(b)(1)(A)(D)**, based not on facts proved to his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong.

It is important to note that this instant case developed exactly on the crossroads between a mandatory and an advisory U.S.S. Guideline, so all those constitutional violations against defendant were also confirmed after the Booker decision, we just need to take a look on that case to illustrate this point:

"More important than the language used in our holding in **Apprendi** re the principles we sought to vindicate. Those principles are unquestionably applicable to the guidelines. They are not the product of recent innovations in our jurisprudence, but rather have their genesis in the ideals our constitutional tradition assimilated from the common law. See **Jones, 526 U.S., at 244-248, 119 S.Ct. 1215.** The Framers of the Constitution understood the threat of "judicial despotism" that could arise from "arbitrary punishments upon arbitrary convictions" without the benefit of a jury in criminal cases. The Federalist No. 83, p. 499 (C. Rossiter ed.1961) ( A. Hamilton). The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta. As we noted in **Apprendi**:

> "[T]he historical foundation for our recognition of these principles extends down centuries into the common law. '[T]o guard against a spirit of oppression and tyranny on the part of rulers,' and 'as the great bullwark of [our] civil and political liberties,' trial by jury has been understood to require that '**the truth of every accusation**, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors....'" **530 U.S., at 477, 120 S.Ct. 2348."**

Regardless of whether the legal basis of the accusation is an statute or in a guidelines promulgated by an independent commission, the principles behind the jury trial rigth are equally applicable."

The illegality of this type of arbitrary enhancement was again confirmed in the case of **Washington v Recuenco, 126 S.Ct. 2546 (U.S. Wash. 2006)**, hinting even that it could be an structural error. **Recuenco** in pertinent part states:

"Before the Supreme Court of Washington heard respondent's appeal, we decided **Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed 2d 435 (2000)** and **Blakely, supra.** In **Apprendi**, we held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." **530 U.S., at 490, 120 S. Ct. 2348.** In **Blakely**, we clarified that "the 'statutory maximum' for **Apprendi** purposes is the maximum sentence a judge may impose **solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S., at 303, 124 S.Ct. 2531** (emphasis in original). Because the trial court in this case could not have subjected respondent to a firearm enhancement based only on the jury's finding that respondent was armed with a "deadly weapon," the state conceded before the Supreme Court of Washington that a Sixth Amendment violation occurred under **Blakely, 154 Wash.2d 156, 162-164, 110 P.3d 188, 191 (2005).** The State urged the Supreme Court of Washington to find the **Blakely** error harmless and, accordingly, to affirm the sentence. In **Washington v. Hughes, 154 Wash.2d 118, 110 P.3d 192 (2005),** however, decided the same day as the present case, the Supreme Court of Washington declared **Blakely** error to be "**'Structural'** erro[r]" which "**'will allways invalidate the conviction.'" Id., at 142, 110 P.3d, at 205 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).**

**Ineffective Assistance of Counsel: Defense Counsel Failed to Notify the Court that the U.S. Attorney Breached the Plea Agreement in Sentencing Hearing**

Although recommending the low end the Guideline, the substance of the prosecutor argument at the sentencing hearing only emphasized defendant's wrongdoing. The Plea Agreement signed on 11/23/04, page 2, ¶2:

> "2. In exchange for Defendant's plea of guilty:
> a. The government will recommend that the Court impose a term of imprisonment at the lowest point of the range of sentences for the offense level determined by the Court under the United States Sentencing Guidelines (the "guidelines") but not lower than any applicable mandatory minimum sentence, and not including probation or a "split-sentence," even if permitted under the guidelines, **provided** that Defendant does not seek a downward departure under the guidelines."

Also, on page 5, ¶9, the Plea Agreement in pertinent part says:

> "In consideration of the concessions made by the U.S. Attorney in this Agreement, Defendant knowingly and voluntarily waives his right to file any FOIA requests related to this case, and also knowingly and intentionally waives any right to appeal or collaterally challenge: (a) his guilty plea and any other aspect of his conviction, including, but not limited to, any rulings on pretrial motions or any other pretrial dispositions of motions and issues; and (b) his sentence, if the **Offense Level** under the guidelines as determined by the sentencing court is **Level 23** or lower".

In this instant case is abundantly clear that Defense Counsel failed to object these AUSA violations of the Plea Agreement, when the AUSA argued excessively and vehemently for a sentence exponentially higher than the induced-upon recommendation of Range **23** (46-57 months).

A defendant entering into a Plea Agreement with the government undertakes to waive certain fundamental constitutional rights; because of that waiver, the government is required to meet "the most meticulous standards of both promise and performance. **Riggs, 287 F.3d (1st Cir. 2002), Santobello v. New York, 404 U.S. 257 (1971).**

Now, we have to take a good look in the magnifying-glass prosecutor's version of the one and unique illegal transaction of Case #04-074S, on the Sentencing Hearing transcript, page 16 (7-18):

> "...The defendant involved two other individuals to deliver the drugs to the cooperating witness and to collect the money. The fact that he stood off to the side, as Mr. Olen put it, far from being evidence that he was not a leader/organizer, is the hallmark of a leader/organizer, sophisticated or higher level drug dealer who keeps himself distant from the actual exchange of the drugs from--he does not touch the drug himself, isn't there to have the money placed into his hands, but gest other people to do that work for him."

As defendant has explained in other chapters of this motion and when speaking to the U.S. Government about this particular sale, this solitary illegal transaction occurred within a close family setting, so there was no need to plan or set up anything, less sophisticate nothing; therefore all those exaggerated prosecutor's remarks were just superflous rethorical suppositions. In this case #04-074S the U.S. Attorney said that they have many recorded tapes, defendant's challenge them to produce just one tape where defendant is giving an order to anyone involved in this lone federal violation; defendant's is absolutely sure that those prosecutor's suppositions are just that **inflated suppositions**, not supported for anything in the records. Defense Counsel failed for not notifying the Honorable Court that with those inflated suppositions, the prosecution was violating the spirit of the signed Plea Agreement. As you can see this was a terrible performance of Defense Counsel, when Counsel fails to present "significant and obvious issues while pursuing substantially weaker ones, that conduct constitutes Ineffective Assistance of Counsel." **See Evitts, 469 US at 394.**

Those inflammatory statements of Mr. Weinreb without any doubt demonstrated that the prosecution was violating the spirit of the Plea Agreement, therefore, a breach of a Plea Agreement is deemed a violation of that agreement by the government, not by the sentencing judge.

When a plea rests in any significant degree on a promise or agre-ement of the prosecutor, so that it can be said to be part of the in-ducement or consideration such promise must be fulfilled. **See <u>Santo-bello v. New York, 404 US 257, 262; 92 S.Ct. 495 (1971)</u>.** Because plea bargaining requires defendants to waive fundamental constitutional rights, the Courts hold prosecutors engaging in plea bargaining to the "most meticulous standards of both promise and performance." **See <u>U.S. v. Velez Carrero, 77 F.3d 11 (1st Cir.1996) (quoting U.S.v. Clark,</u> 55 F.3d 9, 12 (1st Cir.1995)).**

In this case, the government fell woefully short of satisfying these "meticoulous standards. Although the plea agreemnet bound the government to recommend a sentence at the low end of the guideline ba-sed on a drug quantity of 1 Kilo, the government utterly failed to do so; instead the government continued exagerating his version of the very few facts related to that lonely transaction; let's take a look now on page 17 of the Sentencing Hearing:

> "...It may be that the cooperating witness asked him if he could purchase a kilo of cocaine from Mr. Gi-raldo. It was Mr. Giraldo who made the decision about whether that deal would occur, when it would occur, where it would occur and how much money would be charged for the kilo of cocaine. That is all set out in the facts in the PSR..."

Again those are empty words that never demonstrates a leadership in a so simple transaction like this, quoting William Shakespiere is just "Too much ado about nothing" when in fact the same thing can be said of any independent street-level illegal drug deal; no street-level drug sale could ever be made without a customer, a time and location for the sale, and a price. Moreover this government's leader role argument is unsubstantiated, there is simply no evidence that defendant exercised any control over the movement of anyone and the U.S. government knew this. It was a very simple illegal deal between family members to solve a mounting economic necessity of the orchestrator of this lone illegal transaction, my brother Mr. Alberto Vasquez (being coached by the D.E.A. to say whatever they want).

It is understandable that defendant was the object of the investigation and that the U.S. government were looking for a conviction, that's part of their job, defendant respect that and accepted his guilt but to make him a leader of nothing, that's a beast of a different color, the evidence in this case does not support such leader enhancement; after signing the Plea Agreement, the U.S. Attorney was bound to the terms of that agreement; here Defense Counsel failed to object this blatant breaching of the Plea Agreement.

Defendant is sure now that that out of proportion U.S. government version of those simple facts was made with the only purpose to offset defendant access to the "Safety Valve" (If the defendant meets the criteria set forth in subdivision (1)-(5) of subsection (a) of USSG §5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels), another clear hardball tactic of the government in violation of the Plea Agreement.

It was absolutely clear that defendant met all the required criteria related to sections 2D1.1(b)(6) and 5C1.2:

1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

2) the defendant did not use violence or credible threats of violence or possesss a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

3) the offense did not result in death or serious bodily injury to any person;

4) the defendant was not an organizer, leader, manager or supervisor of others in the offense as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise as defined in 21 USC §848; and

5) not later that the time of the sentencing hearing the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has not relevant or useful other information to provide or that the government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

All this shows undoubtely that defendant's V and VI Amendments rights were violated due to Defense Counsel lack of efficiency because did not advance any argument based on the fact that the prosecution was breaching the plea agreement, making inflammatory statements to support an enhancement for an inexistent 'Leader Role' (blocking on the same time the implementation in favor of defendant of 2D1.1(b)(6) and 5C1.2). Under the plea agreement, the goverment was obligated to make arguments to recommend "incarceration at the low end of Range 23" as was promised.

In demonstration of defendant's suppossed leader role, the prosecution only evidence was to read word by word the commentary to USSG #3B1.1, Application Note 4, whithout showing nothing tangible, such as a recorded phone call or any other fact-probative proof.

> "...The commentary to 3B1.1, in particular Application Note 4, says that "in looking at the leadership and organizational role, one should consider the existence of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the degree of participation and planning and organizing the offense, and the degree of control and authority exercised over others." Every one of those factors points to Mr. Giraldo as being a leader and organizer of the offense."

So just like that, very simple, the U.S. Attorney arrived to that assumption just because the USSG say so. For some extrange reason the U.S. Attorney forgot to include in his allocution the most important element of this commentary, **"the claimed right to a large share of the fruits of the crime".**

Why on purpose Mr. Weinreb forgot **only** that most important element of that commentary? Because the Background to the Commentary on 3B1.1 clearly states:

> "...However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense **tend to profit more from it.**"

Of course, the prosecutor knew that defendant was not receiving one penny from that solitary illegal transaction; defendant was just helping (thru an illegal act) family members to solve an economic dificulty; illegal transaction being done on the own work and initiative of brother Alberto Vasquez (who in reality had turned government informant after being paid $13,000 monthly by the D.E.A. to coach him and to obtain defendant's higher-time-possible-conviction).

The fact that defendant was being successfull in other legal business ventures and gambling in no way make him a leader in a asinine illegal drug transaction. As all party here knows, defendant was not hiding his income, all his income were being deposited in U.S. bank accounts as was confirmed by Mr. Scott Lawson (U.S. Dptm of Justice) in his investigation of defendant's financial transactions. Mr. Lawson only found liable a minor part of those deposits, making the base for the Tax Evasion/Money Laundering Case (Case 05-053S), defendant already pled guilty to those minor money-handling violations but these facts are no enough to proof that he organized or controlled a drug deal; they are two very independent things. Defense Counsel failed to demonstrate that the government was breaching the plea agreement in making hyper-exaggerating inferences related to that solitary transaction of March 14, 2004. **<u>Riggs</u>, 287 F.3d 221 (1st Cir. 2002).**

The record in this case does not show any tangible or intangible evidence that defendant had any sort of hierarchic superior relationship with the family members who were purportedly his subordinates. The concepts of "organizer" or "control" are implicit in the notion of "leader", to connote that sort of superior relationship, in the sense that an employer is superior to his employeee. The prosecution did not have any proof that defendant was superior to his co-conspirators (including paid brother Alberto Vasquez). Instead, the government focused their augmented and fictional version of leadership role, just based on defendant's life-style rather than what for really happened, a one and very simple illegal transaction on March 14, 2004.

**INEFFECTIVE ASSISTANCE OF COUNSEL: DEFENSE COUNSEL FAILED TO INFORM THE COURT THAT DUE TO DEFENDANT'S ALIEN/DEPORTABLE STATUS THE SEVERITY OF HIS SENTENCE WAS INCREASED**

Because of defendant's status as a deportable alien, the defendant is ineligible to receive the rewards of a timely half-way house release that is normally given to all other U.S. Citizen inmates. This is a flagrant violation of the Equal Protection Clause of the U.S. Constitution. Unless he fits within a narrow exception, an inmate who is a "deportable alien" is automatically given a "public security factor" (PSF) designation, rendering him ineligible to serve his sentence in a minimum security facility or halfway house, along with other inmates from whom society requires protection. **18 USCA §3624(c).**

One of the purposes of departure from guidelines sentence was to ensure a measure of equality in the penalty imposed on defendants guilty of comparable criminal acts. In determining the appropriateness of a downward departure from the guidelines, formulation of a sentence that is not "unreasonably harsh under all the circumstances of the case" must take into account a penalty such as deportation that is visited upon the defendant by law as a result of his conviction. **See 18USCA §3553(a).**

Where a collateral consequence is harsh and follows directly from the conviction of an offense, it is an added deterrent to the commission of a crime and will compensate for any diminution in the deterrent efect of a shorter term of imprisonment, in determining whether downward departure from the Sentencing Guidelines is appropriate. All this flagrant and obvious violations of the Equal Protection Clause of the U.S. Constitution places the petitioner on a clear disadvantage and to serve his sentence under circumstances harsher and more severe than those

facing citizens under similar circumstances. Please see **U.S. v. Smith**, 27 F.3d 649 (D.C. Cir. 1994) ("a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence."); see also **U.S. v. Veloza**, 83 F.3d 380 (11th Cir. 1996)(alien's ineligibility for pre-release confinement is a permissible basis for departure). "Collateral Consequences" are not part of the judgement of conviction and are not imposed upon the defendant for the purpose of punishing him.

The issue presented by this case is whether unusual harsh collateral consequences that are visited by law on a defendant as a result of his conviction may provide a basis for mitigating the penal sanction that would otherwise be required by the Sentencing Guidelines. The effect of such consequences, however, are as punitive as a term of incarceration. This particularly true in this case where the collateral consequences is deportation and where a consequence of that consequence is a longer period of imprisonment under more severe conditions than would apply to a U.S. Citizen convicted of the same offense. **U.S. v. Restrepo**, 802 F.Supp 781 (E.D.N.Y. 1992). The extraordinary harsh and disparate nature of this penalty was acknowledged by the Supreme Court in **Jordan v. DeGeorge**, 341 U.S. 223, 71 S.Ct 703, 95 L.Ed 886 (1951).

The Supreme Court stated as follows: Respondent, because he is an alien and has been convicted of a crime the Court holds involve "moral turpitude" is punished with a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts. Id., at 232, 71 S.Ct at 708 (1951).

Unlike U.S. Citizens who commit the same offense, who are equally culpable and who receive identical Guideline Sentences, the petitioner in this case will not be eligible to serve his sentence in a minimum security facility **Calder v. U.S.**, 918 **F.Supp 68 (1996); U.S. v. Restrepo**, 999 **F.2d 640-645 (1993); U.S. v. Adubofor**, 999 **F.2d 639 (1993).** Nor a portion of the last ten [10%] percent of his sentence in a half-way house or other community custody programs, including home confinement. **U.S. v. Charry Cubillos**, 91 **F.3d 1342 (1996);** Section III very clear talking about minimum security & Community Confinement. **U.S. v. Leandre**, 132 **F.3d 808 (1996); Saro**, 24 **F.3d 286; U.S. v. Soto**, 132 **F.3d 56 (1997).** The deportable status would affect the severity of the sentence. **U.S. v. Ferreira**, 854 **F.Supp.2d 854-55 (2002).** Explaining very clearly the harshness. & **Gissendamer v. Menifee**, 975 **F.Supp 249-251 (1997)** talking about denial of Boot Campt due to Alien Status.

The petitioner therefore suggests that this Court could use its discretionary powers to remedy the grave injustice under which petitioner is serving his sentence, by granting the petitioner an additional reduction of his original sentence imposed in this case. This would compensate for the unequal treatment that petitioner has been forced to endure solely due to his status as a Foreign National serving his sentence in the United States System.

In the "Interest of Justice" the petitioner respectfully requests that this Court grant consideration to this issue too, and to consider it in the reduction of sentence.

**Ineffective Assistance of Counsel: Defense Counsel failed to notify the Honorable Court that Petitioner is Entitled to a Downward Departure Due to his Status as a Deportable Alien**

In Koon v. U.S., 518 U.S. 81, 135 L.Ed.2d 392, 116 S.Ct 2035 (1996), the Supreme Court explained that the district court enjoys broad discretion in deciding whether to depart under § 5K2.0 when the particular facts of the case are outside the "heartland" of guideline cases.

> The goal of the U.S.S.G. is, of course, to reduce unjustified disparities and so reach towards the even handedness and neutrality that are the distinguishing marks of any principaled system of justice. In this respect, the U.S.S.G. provide uniformity, predictability, and a degree of detachment lacking in our earlier system. This too must be remembered, however. It has been uniform and constant in the Federal Judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigates, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the Congressional purpose to withdraw all sentencing discretion from the United States District Judge. Discretion is reserved within the U.S.S.G., and reflected by the standard of appellate review we adopt.

Koon, 518 U.S. at 113 (emphasis added). Thus, Koon, allows a court to take into consideration any unusual or exceptional factor present in the case. Id.

In his much cited opinion, the learned Judge Breyer of the First [1st] Circuit Court of Appeals explained the proper analytical framework under which sentencing court should consider downward departures. U.S. v. Rivera, 994 F.2d 942 (1st Cir. 1993).

In **Rivera**, Judge Breyer stated that there are four [4] basic types of downward departures. First, the Guidelines consider cases outside the "heartland". These would be cases that are unusual when compated to the normal case that courts would see. **Id., at 947.**

> In the words of the Guidelines themselves, when a court finds an atypical case, one to which a particular guideline linguistically applies, but where conduct significally differs from the norm, the court may consider whether a departure is warranted .....the commission does not intend to limit the kinds of factors, whether or not listed in anywhere else in the guidelines, that could constitute grounds for departure in an unusual case. **U.S.S.G. Ch. I, Pt. a, Intro Comment 4(b).**

As Breyer points out, the Sentencing Commission clearly intended that any case found to be sufficiently unusual could qualify for departure. Moreover, the factors which the court considers when deciding in a case is unusual are almost limitless. **Rivera, 994 F.2d at 947 (1993).** Therefore, as Judge Breyer clearly states, the primary question under the Sentencing Guidelines is whether the case falls in the heartland. **Id., at 948.** As the court in **Rivera**, noted "(T)hus, (with a few exceptions) the law tells the Judge to ask basically 'Does this case fall within the "heartland" or is it unusual case?'"

Next, the Guidelines deal with "encouraged departures." These are factors listed in part 5K of the Guidelines. **Id., at 948.** As Judge Breyer points out, the Sentencing Court can feel comfortable when ordering a departure under 5K. **Id.**

In short, the Sentencing Commission felt as though these factors (which include the victim's conduct, the use of dangerous instrumentalities, coercion or duress, diminished capacity, etc.) are types of factors that will arise in many cases and in some cases, warrant some sort of special treatment. Id.

Next, Judge Breyer describes the disouraged departures. These are the departures based on factors listed in Part 5H. Discouraged departures may only be awarded when the factors being considered is present to an extraordinary degree. Id. However, Judge Breyer clearly points out that even factors listed in Part 5H (including age, education, family ties, etc.) can be the basis for a downward departure. Id. Finally, there are forbidden departures, these factors which cannot place a particular case outside the heartland. Id These factors generally have Constitutional considerations and include sex and national origin. Id. at 949 (1993).

The Fourth Circuit has recognized part of Judge Breyer's learned analysis in its recent decision. For example, in **U.S. v. Jones, 18 F.3d 1145 (4th Cir. 1994)** the Circuit Court clearly recognized that under Section 5K2.0, the sentencing courts are permitted to depart downward in several circumstances. The Court stated, "sentencing Judges have the power to depart when confronted with circumstances of a kind, or to a degree, not adequately taken into consideration by the sentencing commission." Id, **at 1148.** At the same time, the Court recognized that factors listed in Part H must be present to an extraordinary degree in order to provide for departure. Id.

Moreover, the Guidelines themselves mandate that there should be little limit to the factors to be considered by the sentencing courts. The Guidelines clearly state "(W)ith those specific exceptions (Part 5K factors), however, the Commission does not intend to limit the kinds of factors. Whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch.1, Pt.A. Intro. Comment, section 4(b). It is clear from this commentary that the Commission did not intend to limit the factors that the district courts may use in determining whether a departure is warranted.

Therefore, it is clear that this Circuit has clearly adopted the position that even factors taken into account by the sentencing commission can form the basis for a downward departure when present to an extraordinary degree. Moreover, this Circuit's implied differentation between Part 5K factors and Part 5H factors clearly is in harmony with the reasoning in **Rivera, supra.** It is clear that downward departures are permitted under the Sentencing Guidelines when the case is outside the heartland when there is a mitigating factor listed in Part 5K present, when there is a mitigating factor considered in Part 5H that is present to an extraordinary degree, or when there is present a factor not considered by the Sentencing Commission. Consequently, the petitioner in the instant case should receive a consideration for a downward departure from the otherwise applicable sentencing range based on at least one mitigating factor.

In U.S. v. Smith, 27 F.3d 649 (D.C. Cir. 1994), the court concluded that "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." Id. The court found that a defendant's status as a deportable alien could limit the defendant's access to community confinement, as well as his incarceration in minimum security facilities, during a portion of the defendant's sentence. The Court noted that a downward adjustment in anticipation of the Bureau of Prisons application of assignment policies, which would excerbate the severity of the defendant's sentence. The Bureau of Prisons policy to exclude some deportable aliens from the community confinement programs or incarceration in minimum security facilities was based, in part, on the greater likelihood of escape. The Court noted that:

> "If a deportable alien is assigned to a more drastic prison than otherwise solely because his escape would have extra consequences of defeating his deportation, then the defendant's status as a deportable alien would have clearly generated increased severity and, thus, might be 'the proper subject of a departure.'" Id.

The Court remanded for the District Court to take these considerations into account during sentencing. Id. Please see also U.S. v. Veloza, 83 F.3d 380 (11th Cir. 1996) alien's ineligibility for pre-release confinement is a permissible basis for a departure.

Additionally, the Seventh [7th] Circuit has recently held an individual's status as a deportable alien may justify a downward departure in certain circumstances. **U.S. v. Farouil**, 124 F.3d 838 (7th Cir. 1997). In **Farouil**, the appellant claimed that the district court erred in refusing to grant him a downward departure based on his status as a deportable alien. **Id.** at 847.

The Seventh Circuit relied on the recent Supreme Court case of **Koon v. U.S.**, 518 U.S. 81, 135 L.Ed.2d 392, 116 S.Ct 2035 (1996), as well as **Smith**, supra, in making the determination that an individual's status as a deportable alien may warrant a downward departure. **Id.** The Court explained that **Koon** "generally informs us that the district court enjoys broad discretion in deciding whether to depart when the particular facts of the case are outside the 'heartland' of guideline cases." **Id.** at 847 (citing **U.S. v. Purchess**, 107 F.3d 1261, 1271 (7th Cir. 1997)).

In **Farouil**, the Appelland was charged with importing heroin into the United States, and the Court found there was no reason to believe that the Guidelines have accounted for Appellant's status as a deportable alien. **Id.** at 847. "The District Court is thus free to consider whether Farouil's status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement. Since the district court apparently was under the impression that it lacked discretion to depart on this basis, the case was remanded for resentencing so the Court could again consider Mr. Farouil's motion for a downward departure in his status.

The petitioner contends a similar result should occur in his situation. Not only is the petitioner subject to deportation upon his release, but also, he will not receive the benefit of community incarceration and may be subject to a higher security level. Moreover, the petitioner's status as a deportable alien precludes him from many Bureau of Prisons programs otherwise available to U.S. Citizens, already mentioned at page first paragraph. In addition, the petitioner will likely be further detained by Immigration officials, until it gets confirmed that petitioner complied with his removal process.

Thus, petitioner will be subject to harsher conditions of imprisonment than other similarly situated defendants due to his alien status. Further, as long as the petitioner remains in prison, he is a strain to the entire system's resources, both financial and personnel. Therefore, a downward departure is warranted.

**U.S. Sentencing Commission Releases 15-Year Report on Impact of Guidelines**

It was published in Criminal Law Reporter Vol. 76, No. 9, page 151, with date of December 1st, 2004. Research Series on the Recidivism of Federal Guideline Offenders, from year 1987 to 2002. It found the following facts, probation decreased 66 percent, 86 percent of offenders now do some prison time, which is 20 percent higher than in the pre-guideline era. Moreover, the federal prisoner now serves about twice as much time.

The first largest segment of the federal docket are drug cases. Mandatory Minimum Sentences and the use of unduly high drug conver sion ratios, have resulted in disproportionately lengthy terms of incarceration for drug offenders, given the relative harmfulness of the drugs and offenders role in the offense.

Ethnic and racial disparities in the likelihood that offenders will be sentenced to prison and in the length of those prison terms increased during the guideline era, but only for drug offenders. Black and Hispanic drug offenders are 20 and 40 percent more likely to be sentenced to prison. That report also states that 75.7% of offenders do not recidivate. That a man in the age of 36-40 have 19.7% to recidivate. Too says, that Hispanic offenders, are the se cond ones to not recidivate. That those who had stable employment in the year prior to their instant offense are less likely to recidivate, only 19.6%. Defendants that have at least a High School Education are 19.3% to recidivate. Offenders who are married are less likely to re cidivate, only 13.8%. Offenders not using illicit drugs recidivate 17.4%. Offenders with Guideline Instant Offense level 31-43 are the third less likely to repeat new offenses.

As stated previously by present petitioner, these are factual findings made by the own United States Sentencig Commission, respect fully mentioned to this Honorable Court, to demonstrate that there will be no further crimes from petitioner, that there is no reason to delay petitioner's release, because he has demonstrated with ample evidence, that he is a different man coming in front of this Court today.

## CONCLUSION

Here is perspicuous that the prosecutor has broken a promise made in return for the agreement to plead guilty. When a prosecutor breaks a bargain, he undercuts the basis for the waiver of constitutional rights implicit in the plea; where a promise is "unfulfilled", **Brady v. United States, 397 U.S. 742, 755 (1970)**, specifically denies that the plea "must stand." While it can be argued that the government stopped short of explicitily repudiating the agreement, **Santobello** prohibits not only "explicit repudiation of the government assurances, but must in the interests of fairness be read to forbid end-runs around them." **Santobello v. New York, 404 U.S. 257 (1971).**

Also, this instan case shows undoubtelly that defendant's V and VI Amendments rights were violated due to defense lawyer lack of efficiency because did not advance any legal arguments based on the facts that defendant's Plea Agreement contract was being violated by the prosecution. The Sixth Amendment provides the Defendant with the right to effective assistance of counsel. **Evitts v. Lucey, 469 US 387 (1984).** To succeed in his claims of Ineffective Assistance of Counsel, Petitioner must satisfy the two prong standard test announced in **Strickland v. Washington, 466 US 668 (1984).** Petitioner must demonstrate both that his counsel's conduct was deficient and that the deficiency prejudiced the result of the proceedings.

Defendant is mindful that counsel is not required to raise every conceivable argument, **Evitts, 469 US at 394;** however, when counsel fails to present "significant and obvious issues while pursuing substantial weaker ones, his conduct constitue ineffective assistance of counsel.

The circumstances of this case fall squarely within the framework delineated in **Evitts**. Had counsel adequately set forth all legal arguments based on the benefits that petitioner was entitled according to the Plea Agreement, there is a reasoble probability that petitioner would have received a lower offense level (at least the agreed upon level 23), rendenring Petitioner's sentence lower than the actual sentence received.

Given the background of this case, it is difficult to imagine what tactical advantage or cost could justify counsel's decision not to set forth adequate legal arguments or raise those favorable issues for defendant on sentencing and direct appeal. The prosecutor's violation of the plea agreement was all around; the "leader role" allegation of the original indictment was eliminated completely from the Plea Agreement (see atachment); defendant never admitted the "leader role" allegation; therefore, the "leader role" enhancement in sentencing generated a **plain** Apprendi/Blakely/Booker **error**. However in sentencing the government made inflammatory statements to support that illegal "leader role enhancement" in a blatant violation of the Plea Agreement

Considering the likely sucess of defendant's claims, it is abundantly clear that defense counsel was ineffective and defendant was prejudiced; if not for counsel unprofessional errors, result of the proceedings would have been different.

**Therefore**, for all the foregoing reasons, the defendant respectfully requests this Honorable District Court to examine all issues as they apply to this defendant and provide relief accordingly, vacating the sentence and sending the case back to the Court for further proceedings.

**CERTIFICATE OF SERVICE**

I affirm that the contents of this motion are true and correct, originals and copies were mailed to:

Clerk of Court, United States District Court, District of Rhode Island, 1 Exchange Terrace, Room 119, Providence, RI 02903.

Mr. William Weinreb, United States Attorney's Office, 1 Courthouse way, suite 9200, Boston, MA 02210.

This Motion sent this MAY 3, 2007 by way of the FDC Miami prison legal mail box.

JUAN GIRALDO # 25255-038 USM/BOP DEFENDANT PRO SE
FDC MIAMI
FEDERAL DETENTION CENTER
P.O. BOX 019120
MIAMI, FL 33101